UNITED STATES DISTRICT COURT WESTERN DISTRICT OF NEW YORK

_____

CHRISTOPHER GIFFORD,

                          Petitioner,

        -vs-                              **No. 6:13-CV-6060(MAT)**
                                          **DECISION AND ORDER**
DALE ARTUS,

                          Respondent.

_____

## I.    Introduction

Proceeding <u>pro</u> <u>se</u>, Christopher Gifford ("Gifford" or "Petitioner") filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. 2254, alleging that he is being held in Respondent's custody in violation of his federal constitutional rights. Petitioner is incarcerated as the result of a judgment entered July 10, 2007, in New York State Supreme Court (Monroe County) following a jury verdict convicting him of one count each of felony murder, first degree rape, and intentional murder.

## II.   Factual Background and Procedural History

### A.    Overview

On November 29, 1995, Patricia Daggett ("Daggett") was found dead behind an abandoned building on Skuse Street in the City of Rochester. On August 25, 1996, Lachelle Weaver ("Weaver") was found dead in her home on Murray Street in the City of Rochester. Both woman had died as the result of ligature strangulation. Petitioner was arrested in connection with both homicides after DNA testing

performed in 2004 indicated that Petitioner had engaged in sexual intercourse with each victim hours or days prior to their deaths.

The matter was presented to a Monroe County grand jury which returned an indictment against Petitioner charging him with the intentional murder of Weaver (New York Penal Law ("P.L.") § 125.25(1)) by strangling her and/or slashing her neck. Petitioner was charged, as both a principal and an accomplice[1] (P.L. §§ 20.00, 125.25(1)), with intentionally murdering Daggett by strangling her; with first degree rape of Daggett by forcible compulsion, as both a principal and an accomplice (P.L. §§ 20.00, 130.35(1)); and with felony murder of Daggett as both a principal and an accomplice (P.L. §§ 20.00, 125.25(3)), by causing her death during the alleged rape.

Petitioner was tried before a jury in Monroe County Supreme Court (Affronti, J.). A summary of the relevant evidence proffered by the prosecution follows.

**B.   The Proof at Trial**

### 1.   Daggett's Homicide

On the evening of November 28, 1995, Milburn Keith Evans ("Evans") was at the Chamberlin Street residence of Frederick Walker ("Freddy"). Also present were Petitioner (a/k/a "Kilo"),

---

[1]

Petitioner's co-defendant, Howard Wright, was tried separately, convicted of murdering Daggett, and sentenced to 25 years to life.

Howard Wright ("Wright", a/k/a "Tuna" or "Supreme"), Daggett, and Daggett's infant child. T.532-35.[2] Evans, a self-described hustler, was selling drugs that evening; Freddy and Daggett were using cocaine. T.554. Evans knew Daggett at that time by the moniker, "Red".

At some point, Daggett left with her baby and then returned alone to Freddy's house. T.534. At about 7 p.m. or 8 p.m., Daggett left Freddy's house and drove away in her 1985 Chevrolet with Petitioner, Wright, and Evans as passengers. Daggett dropped Evans off at his apartment at 1210 North Clinton Avenue and drove off with Petitioner and Wright. T.539, 718.

At about 11 p.m., as Evans was walking to a pay phone to call 911 after his girlfriend injured him during a domestic dispute, he saw Petitioner and Wright walking down the street. Daggett was not with them, and Evans did not see Daggett's car. T.540.

Evans saw Petitioner and Wright again when he returned from the emergency room to his apartment at around 1 or 2 a.m. T.541. Evans saw Petitioner and Wright once more sometime after sunrise; this time they were riding in Daggett's car. T.543-44. Evans testified that he only saw Wright and Petitioner in the car. T.544. The next time Evans saw Daggett was when he saw her photograph in the newspaper the next day.

---

[2]

Citations to "T.___" refer to pages from the trial transcript, submitted by Respondent in connection with his answer to the instant petition.

-3-

Another resident of the apartment building, Mildred Anderson ("Anderson"), saw Daggett's car in "the wee hours of the morning" as it pulled out of the back of the Coleman Building. T.720, 725, 730. At that time, Anderson only saw Tuna (Wright) and Kilo (Petitioner) in the car. T.721. Anderson admitted that she could not see in the back seat of the car and did not know who was driving. T.727.

At approximately 9 a.m. that morning, Robert Herko ("Herko") was at his storage business on Skuse Street when one of his employees told him that a young lady was sleeping on the porch next door. T.572-73. Herko found the woman lying "disheveled on the steps," with "her top ripped up" and "a mark on her neck". T.574. Herko checked for a pulse and determined that "[s]he was gone". Id. He covered her body and called 911 Id.

When the police responded to Skuse Street, they found that Daggett had been bound behind her back with a black shoelace, had sustained bruising on her face, and apparently had been strangled with another black shoelace. T.578. She was not wearing shoes or socks. T.584. The autopsy results were that Daggett died as a result of asphyxia secondary to strangulation by ligature. T.687-88, 711.

During the autopsy, the medical examiner found one of Daggett's socks bunched up on the inside of her trousers, in the region of her left buttock. T.695. Two hairs were recovered from

Daggett's external genitalia. The hairs were of mixed racial characteristics, dark in color, and dissimilar to Daggett's hair. T.469. Semen stains were discovered on Daggett's panties, and vaginal and perineal swabs revealed the presence of semen. T.452, 455-56. The medical examiner testified that the sperm could have been there for "perhaps" as long as a few days.  T.713.

The following day (November 30, 1995) at around noon, police located Daggett's car parked on Burbank Street, one block north of 1210 North Clinton Avenue. T.587-88. Inside the vehicle, they found, among various items of detritus, a single pink sock. T.593, 596.

The case remained cold for about a decade until 2006, when DNA testing was performed on the ligatures around Daggett's wrists and neck, the hairs collected from Daggett's body, the vaginal swab, and the stain on her underwear. The DNA profiles retrieved from these items were compared to DNA samples from Daggett, her husband, Freddy, Christopher Walker, Evans, Wright, and Petitioner. T.663, 668-70. DNA testing of the neck ligature found only Daggett's DNA profile. T.665. With respect to the wrist ligature, Y-chromosome short tandem repeat ("STR") DNA testing showed a mixture of more than one male and excluded all of the tested subjects except Daggett's husband and Wright. T.804. As to the hairs recovered from Daggett's body, mitochondrial DNA ("mDNA") testing showed that the lighter hair matched P.D., whereas the black hair had the same

mitochondrial profile as Petitioner. The expert witness testified that she could exclude 98 percent of the population as having the same mitochondrial profile as that found on the black hair. T.809-11.

On both the vaginal swab and the semen stain from the victim's underwear, there were intact sperm cells. T.762. With respect to the vaginal swab, the cells would have remained intact in a living woman for approximately 14 hours. T.762. There was no way to determine which of the contributors left the intact sperm cells. Id.

With respect to the vaginal swab, the DNA was a mixture of more than one male. T.752-53. Testing of the sperm fraction of the vaginal swab excluded Daggett, Daggett's husband, Freddy, Christopher Walker, and Evans. T.755. However, testing could not exclude Petitioner. T.755. The probability of randomly selecting an individual who could be a contributor of that DNA was less than one in 337 million, and excluded 99.99 percent of the population. T.757. Y-chromosome STR DNA testing of the vaginal swab could not exclude Petitioner or Wright as contributors. T.806.

The DNA found on in the semen stain on the victim's underwear had at least four contributors. T.753. Testing could not exclude Daggett, Daggett's husband, Petitioner, or Wright as contributors. T.755, 808. The probability of randomly selecting an individual who

could have been a contributor of the DNA was less than 1 in 384 million, and excluded 99.73 percent of the population. T.757-58.

## 2. The Weaver Homicide

In August 1996, Weaver was living on Murray Street in the City of Rochester with her six-year-old daughter, J.F. On August 24th, J.F spent the evening at the home of L.W.'s close friend and next-door neighbor, Andrea Lynette Love ("Love"), with Love's three-year-old daughter. T.354-55, 372. Sometime after 11 p.m., J.F. and Love's daughter went back to Weaver's house and got into bed with Weaver. The two girls fell asleep watching movies. T.356. At some point in the night, J.F. awoke to her mother's scream, and also heard a male voice. However, J.F. went right back to sleep. T.356-57.

When J.F. awoke again, she went downstairs, where she found her mother lying naked on the floor on her stomach, with blood around her. T.357-58. The front door to the house was open. J.F. tried to close the door and then went back upstairs where she hid under the covers until morning. T.359. At approximately 6 a.m., J.F. and Love's daughter went next door to Love's house to tell her what had happened. T.359, 375. Love went to Weaver's house where she saw her friend lying dead in the living room and called 911. T.377.

When police responded to the scene, they found no signs of forced entry. T.395. Apart from a necklace on the floor and a

broken Nintendo cord, there were no signs of a struggle. T.395, 409. A serrated knife lay near Weaver's body in a pool of blood. T.386, 388. A bottle of cleaning solution was on a counter near the front door, and there was a mop near the body that was still wet. T.402-03, 411, 424.

Personnel from the medical examiner's office placed bags over Weaver's hands before placing her in a body bag. T.406. When an autopsy was later performed, the medical examiner recovered a hair from each hand. T.414. The medical examiner also collected a blood sample and oral, vaginal, and rectal swabs. T.415. Seminal fluid was found on the vaginal swab. T.444. The medical examiner determined that the cause of Weaver's death was a combination of sharp force injury to her neck and strangulation by ligature. T.780.

As with Daggett's case, Weaver's murder went unsolved for about a decade. In 2006, the hairs recovered from Weaver's hands were sent out for mDNA testing. T.464-65. The results indicated that one of the hairs could not be excluded as coming from Weaver. T.518-19. The other hair, however, could not be excluded as coming from Petitioner or his maternal relatives. T.519. Out of the entire population of North America, 96.08 percent of those individuals could be excluded as the source of the second hair. T.521.

New testing also was performed on the seminal fluid found on the vaginal swab. STR DNA testing had already been performed on the

vaginal swabs and on a sample of Weaver's blood in 2000, but in 2006, an oral swab was obtained from Petitioner and subjected to STR DNA testing. T.635-36. The STR DNA profiles from the vaginal swab and from Petitioner's oral swab were a match. T.641. The probability of randomly selecting an individual with that STR DNA profile was less than 1 in 300 billion. T.643.

### 3.    Petitioner's Statements to Police

On January 11, 2005, at 9:42 a.m., Petitioner met with Investigators Dominick and Coniglio of the Rochester Police Department. T.817. Petitioner waived his <u>Miranda</u> rights and agreed to speak with the investigators. T.818-20. Upon being shown a photograph of Daggett, Petitioner said he did not know her. When asked, Petitioner denied having dated her or having had sexual intercourse with her. T.822. He also responded negatively when asked if he had ever dated or had sex with a red-haired woman or a white woman. T.822-23. When shown a photograph of Weaver and asked the same questions about her, Petitioner denied knowing Weaver, having been in her home, or having dated or had sexual intercourse with her. T.823.

### 4.    The Defense Case

Trial counsel did not all any witnesses. The theory of the defense was that the prosecution did not present any direct or circumstantial evidence that Petitioner actually was involved in either of the two homicides; instead, all the prosecution had shown

was that his DNA was found in the vicinity of the two victims without any indication as to how long it could have been there or under what circumstances it could have been deposited.

**B.   Verdict and Sentencing**

With respect to Daggett, the jury acquitted Petitioner of intentional murder but found him guilty of felony murder and rape in the first degree. T.925-26. With respect to Weaver, the jury found Petitioner guilty of intentional murder (he had not been charged with raping Weaver). T.926. The trial court sentenced Petitioner to consecutive indeterminate terms of 25 years to life for the two murder convictions and to concurrent determinate term of 25 years, with five years of post-release supervision, for the rape conviction.

**C.   The Direct Appeal and Collateral Motions**

On direct appeal, Petitioner's appellate counsel raised two arguments: (1) the evidence was legally insufficient to support the convictions; and (2) the verdicts were against the weight of the evidence. The Appellate Division, Fourth Department, of New York State Supreme Court unanimously affirmed the conviction. People v. Gifford, 79 A.D.3d 1659, 1660 (4th Dep't 2010). The New York Court of Appeals denied leave to appeal. People v. Gifford, 16 N.Y.3d 797 (2011).

While his direct appeal was pending, Petitioner filed a pro se motion to vacate the judgment pursuant to New York Criminal

Procedure Law ("C.P.L.") § 440.10, which was denied in a letter order by Justice Affronti on October 28, 2009. Leave to appeal to the Appellate Division was denied. After his conviction was affirmed, Petitioner filed a second C.P.L. § 440.10 motion, which was denied by Justice Affronti in a Decision and Order dated November 2, 2012. The Appellate Division denied leave to appeal.

### D.   The Federal Habeas Proceeding

This timely habeas petition followed. Respondent answered the petition, interposing the defenses of non-exhaustion and procedural default as to certain claims. Alternatively, Respondent contends, all of Petitioner's claim lack merit. Petitioner has filed a reply brief.   The matter was transferred to the undersigned on December 10, 2013. For the reasons that follow, the petition is dismissed.

## III. Exhaustion

An application for a writ of habeas corpus may not be granted until the prisoner has exhausted all remedies available in state court. See 28 U.S.C.A. § 2254(b), (c). "The exhaustion requirement is designed to assure that the petitioner has  first given the state courts "a fair opportunity" to pass upon his claims." Waterhouse v. Rodriguez, 848 F.2d 375, 381 (2d Cir. 1988) (quoting Daye v. Attorney Gen'l of N.Y., 696 F.2d 186, 191 (2d Cir. 1982) (en banc), cert. denied, 464 U.S. 1048 (1984) (citing Picard v. Connor, 404 U.S. 270, 275 (1971); other citation omitted)). The legal theory relied upon in the federal court must be

"substantially the same" as that presented to the state courts, but need not be identical, provided that "the essential factual allegations and the ultimate constitutional question raised in the federal petition were presented to the state courts." Waterhouse, 848 F.2d at 381 (citing Daye, 696 F.2d at 192, n. 4). The Second Circuit has held that a petitioner also may apprise a state court of the federal constitutional nature of his claim without citing directly to the Constitution by "(a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis in like fact situations, (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, and (d) allegation of a pattern of facts that is well within the mainstream of constitutional litigation." Daye, 696 F.2d at 194.

Respondent argues that Gifford's legal-insufficiency claims were not fairly presented to the state courts because he did not mention the federal source of law on which he relied, cite a case deciding such a claim on federal grounds, or label the claim as "federal". See Respondent's Memorandum of Law ("Resp't Mem.") at 10 (citing Baldwin v. Reese, 541 U.S. 27, 29, 32 (2004)). Although Gifford only cited to New York state law, "it is apparent that he was invoking the legal sufficiency standard which is stated 'in terms so particular as to call to mind a specific right protected by the Constitution.'" Medina v. Artus, No. 09-CV-1190 (LEK/DRH),

2011 WL 841354, *3 (N.D.N.Y. Feb. 17, 2011) (quoting Daye, 696 F.2d at 194). Therefore, the state court was alerted to federal nature of Gifford's, claim and it is exhausted.

## IV.   Legal Principles Applicable to Section 2254 Petitions

A federal court may "entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. 2254(a). Section 2254, as amended in 1996 by the Antiterrorism and Effective Death Penalty Act ("AEDPA"), provides new limitations on when habeas relief  may be granted. If a claim was "adjudicated on the merits in State court proceedings[,]" the writ may not issue "unless the adjudication of the claim . . . (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2554(d). "Clearly established Federal law" is comprised of "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Green v. Travis, 414 F.3d 288, 296 (2d Cir. 2005) (quoting Williams v. Taylor, 529 U.S. 362, 412 (2000)).

V.    **The Merits of the Petition**

    A.    **Grounds One and Two: Legal Insufficiency of the Evidence**

          1.    **Overview**

As Ground One of his petition, Gifford asserts that the evidence was legally insufficient to establish the element of forcible compulsion, as required to prove the offense of first degree rape involving Daggett. As Ground Two, Gifford claims that the prosecution failed to prove beyond a reasonable doubt that he was responsible for Weaver's death. On direct appeal, Gifford argued that the jury impermissibly drew inferences from other inferences rather than from the requisite established facts in order to convict him. The Appellate Division concluded that, after viewing the evidence in the light most favorable to the prosecution, there was "a valid line of reasoning and permissible inferences from which a rational jury could have found the elements of the crime[s] proved beyond a reasonable doubt." People v. Gifford, 79 A.D.3d at 1660 (quotation and citation omitted). The Appellate Division found the prosecution adduced "sufficient established facts from which permissible inferences could be drawn to lead a reasonable person to conclude that defendant raped the first victim[, Daggett,] and that either defendant or his accomplice killed that victim 'in the course of and in furtherance of such crime or of immediate flight'" from that crime. Id. (quotation omitted).  In addition, the Appellate Division found,

-14-

"[p]ermissible inferences . . . could be drawn to lead a reasonable person to conclude that defendant killed the second victim[, Weaver], who was also killed in a similar manner shortly after having sexual relations with defendant[.]" <u>Id.</u> These rulings constitute adjudications on the merits for purposes of § 2254(d)(1).

### 2.  Relevant Law

For a habeas court assessing the legal sufficiency of the evidence supporting a defendant's conviction, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979) (emphasis in original). Under this standard, a defendant "bears a very heavy burden." <u>Einaugler v Supreme Court of the State of N.Y.</u>, 109 F.3d 836, 840 (2d Cir. 1997). Even when "faced with a record of historical facts that supports conflicting inferences [a court] must presume-even if it does not affirmatively appear in the record-that the trier of fact resolves any such conflicts in favor of the prosecution, and must defer to that resolution." <u>Wheel v. Robinson</u>, 34 F.3d 60, 66 (2d Cir. 1994) (quoting <u>Jackson</u>, 443 U.S. at 326).

Where, as here, the state court has adjudicated the merits of a petitioner's legal-insufficiency claim, an additional layer of

deference is due. See Coleman v. Johnson, ___ U.S. ___, ___, 132 S. Ct. 2060, 2062 (2012) (per curiam) (noting that it has "made clear" that insufficient evidence claims "face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference"). A court may not grant habeas relief unless the state court applied the Jackson standard in an "objectively unreasonable" manner. Cavazos v. Smith, ___ U.S. ___, 132 S. Ct. 2, 7, 181 L.Ed. 2d 311 (2011) (per curiam) (reversing circuit court's decision granting habeas petition in light of finding that it was reasonable for state court to determine that jury's verdict was rational; circuit court had improperly re-weighed evidence and credibility of witnesses) (citing 28 U.S.C. 2254(d)(1)).

### 3.   Analysis

The Appellate Division, the last state court to issue a reasoned decision on Petitioner's sufficiency of the evidence of claims, determined that the evidence supporting all of the convictions was sufficient, and, moreover, that the verdicts were not against the weight of the evidence. The only question for this Court is whether the Appellate Division reasonably determined that a rational trier of fact could have found, beyond a reasonable doubt, that Gifford murdered Daggett in the course of, or in furtherance of, committing first degree rape; and that it was Gifford who intentionally murdered Weaver.

-16-

### a.   The Intentional Murder of Weaver

The Court turns first to the intentional murder charge involving Weaver. Identity is always an essential element of a criminal prosecution, but "there is no rule of law that requires identity to be established by an eyewitness. Identity can be inferred through circumstantial evidence." United States v. Kwong, 14 F.3d 189, 193 (2d Cir. 1994) (citations omitted); see also Holland v. United States, 348 U.S. 121, 140 (1954) (circumstantial evidence that convinces jury beyond reasonable doubt sufficient to sustain criminal conviction). "[A] conviction may be based upon circumstantial evidence and inferences based upon the evidence." United States v. Strauss, 999 F.2d 692, 696 (2d Cir. 1993) (citations omitted); see also United States v. Arteaga, 117 F.3d 388, 399 (9th Cir. 1997) (jurors may even draw an "inference upon an inference").

The prosecution here presented adequate proof from which the jury could have concluded that Petitioner was responsible for Weaver's death. The DNA profile obtained from a vaginal swab matched Petitioner's DNA profile to such a degree the probability of randomly selecting an individual with the same profile was less than 1 in 300 billion. Nevertheless, Petitioner told the police that he had never dated Weaver, had never been to her home, and had never had sex with her. Subsequently, Petitioner suggested that the DNA evidence could be explained on the theory that he may have had

consensual sex with Weaver days before the murder. In light of his earlier statement to the police that he had never had any contact with her, the jury was entitled to reject that explanation. The hair found in Weaver's hand when her body was discovered further undermined any possibility that Petitioner may have had consensual sex with Weaver several days prior to the murder, for the results of mDNA analysis on that hair excluded 96.08% of the population as the source, but could not exclude Petitioner.

The Supreme Court has explained that "<u>Jackson</u> leaves juries broad discretion in deciding what inferences to draw from the evidence presented at trial, requiring only that jurors 'draw reasonable inferences from basic facts to ultimate facts.'" <u>Coleman v. Johnson</u>, 132 S. Ct. at 2064 (quoting <u>Jackson</u>, 443 U.S. at 319). The jury was entitled to conclude, as a matter of common experience, a single hair would not remain affixed to a person's hand for several days. Instead, the jury reasonably could have inferred that Petitioner, in fact, was with Weaver on the night of her murder. Morever, the Appellate Division certainly did not apply <u>Jackson</u> in an objectively unreasonable manner in concluding that the evidence was sufficient for a rational jury to find that Petitioner was responsible for intentionally causing Weaver's death. Therefore, habeas relief is not warranted on this claim.

### b.   The Rape and Felony Murder of Daggett

Petitioner argues that the evidence of forcible compulsion was insufficient to establish his guilt of first degree rape, which therefore vitiates his felony murder conviction. Forcible compulsion is defined as the use of physical force or the use of an express or implied threat that places a person in fear of immediate death or physical injury. See N.Y. PENAL LAW § 130.00(8). Petitioner argues that it was far more reasonable to conclude that Daggett had consensual sex with him based on the evidence that they spent several hours together at a drughouse on Chamberlin Street and then traveled in her car together in an apparently amicable manner. According to Petitioner, the evidence was more susceptible to an innocent explanation–that Daggett voluntarily had engaged in sex with Petitioner, and then left on her own volition, perhaps to obtain more drugs. Petitioner states that given the high-crime area in which her body was found, it is just as likely that Daggett was killed after she left his company.

However, where plausible alternative inferences are available from the evidence, a habeas court must defer to the jury's role as the ultimate trier of fact. See Rapetti v. James, 784 F.2d 85, 91 (2d Cir. 1986) (finding that habeas court erroneously infringed on jury's role where it reversed conviction based on insufficient evidence after concluding that defense theory was "equally consistent" with the evidence). Contrary to Petitioner's

-19-

contention, there were sufficient established facts from which a rational fact-finder could have inferred that Daggett did not consent to sexual intercourse with Petitioner and instead had struggled violently against him: Daggett was found lying outside, disheveled, with her hands bound behind her back; she had sustained bruising to her face; her shoes and socks had been removed; one of her socks was in her car while the other was bunched up inside her pants; and she was bound and strangled with her own shoelaces. A rational jury could have inferred, based on these facts, that Daggett's her shoes and socks were removed in the car and her shoelaces were used to bind her hands; and that after she was raped and strangled with her shoelaces, her assailants made a clumsy attempt to dress her before dumping her body on Skuse Street. For evidence to be deemed legally sufficient, it need not have excluded every possible hypothesis of innocence in order to sustain a conviction. United States v. Fiore, 821 F.2d 127, 128 (2d Cir. 1987) (citations omitted).

Petitioner is essentially asking this Court to re-weigh the evidence and to set aside the rational inferences that could be drawn from the circumstantial evidence presented at his trial. Merely contradicting reasonable inferences the jury drew from the evidence at trial is not a sufficient basis for overturning a conviction, for a habeas court may not reevaluate the evidence or draw new inferences. The Court cannot say, on this record, that the

Appellate Division unreasonably applied <u>Jackson</u> in determining that the evidence was sufficient to support all of the convictions. <u>See</u> <u>Coleman</u>, 132 S. Ct. at 2065 ("[T]he only question under <u>Jackson</u> is whether that finding was so insupportable as to fall below the threshold of bare rationality. The state court of last review did not think so, and that determination in turn is entitled to considerable deference under AEDPA, 28 U.S.C. § 2254(d)."). Accordingly, habeas relief is not warranted on this claim.

**B.   Unconstitutional Acquisition of Petitioner's DNA**

Petitioner claims that he is entitled to habeas relief because the DNA evidence admitted at his trial was obtained unconstitutionally. Petitioner's allegations, although less than clear, appear to be based solely on a violation of New York State's DNA-indexing statute, N.Y. Executive Law § 995 <u>et</u> <u>seq</u>. Under Executive Law § 995, DNA records in the state DNA index may be disclosed to a district attorney's office in connection with the investigation of a crime, as happened here. <u>See</u> N.Y. EXEC. LAW §§ 995-c(6)(a), & §995-d(2). The Second Circuit has explicitly held that New York's DNA-indexing statute, although it constitutes a search under the Fourth Amendment, satisfies the Fourth Amendment under the special-needs test (rather than the general balancing test). <u>Nicholas v. Goord</u>, 430 F.3d 652, 671-72 (2d Cir. 2005).

Any other Fourth Amendment-based claim Gifford could assert regarding the acquisition of his DNA is precluded under the

doctrine of <u>Stone v. Powell</u>, 428 U.S. 465 (1976). In <u>Stone</u>, the Supreme Court held that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." <u>Stone</u>, 428 U.S. at 494; <u>see</u> <u>also</u> <u>id.</u> at 481-82.  Indeed, <u>Stone</u> requires only that the State provide petitioner with an "opportunity" to litigate his Fourth Amendment claim. <u>McPahil v. Warden, Attica Corr. Fac.</u>, 707 F.2d 67, 69-70 (2d Cir. 1983). Courts in this Circuit have uniformly recognized that New York state law provides adequate corrective procedures for redressing Fourth Amendment claims. <u>See</u>, <u>e.g.</u>, <u>Capellan v. Riley</u>, 975 F.2d 67, 70 (2d Cir. 1992). Petitioner has not asserted that he was "precluded from utilizing it by reason of an unconscionable breakdown in that process[,]" <u>Gates v. Henderson</u>, 568 F.2d 830, 840 (2d Cir. 1977) (<u>en</u> <u>banc</u>), and indeed, there is no basis in the record for such an assertion.

D.   **Grounds Four and Six: Prosecutorial Misconduct**

1.   **Overview**

In support of Ground Four, Petitioner asserts that the prosecutor impermissibly referenced uncharged crimes during opening statements by referring to Weaver being raped. The prosecutor referred to the match between the DNA profile from Weaver's vaginal

-22-

swab and Petitioner, and said, "Would that be consensual sex? No. Because the hair, the hair that [the victim] was grasping during the struggle with [Petitioner] over her life, that's the telling factor here. . ." T.343.

Petitioner also asserts that the prosecutor referred to an uncharged crime and violated the Sixth Amendment's Confrontation Clause when the prosecutor said that several days after Daggett's murder, Petitioner and Wright "were then overheard bragging about how they strangled this woman, stole her car and dumped her body. . ." T.346. Petitioner claims that by this comment, he was accused of an unindicted crime (i.e., "grand theft"). In addition, he asserts, the prosecutor impermissibly referred to the expected testimony of a witness who did not ultimately testify at the trial.

Both of these claims were raised for the first time in Petitioner's second C.P.L. § 440.10 motion to vacate the judgment. The trial court gave several bases for denying the claims, including C.P.L. § 440.10(2)(c), which provides that a court "must deny a motion to vacate a judgment when . . . [a]lthough sufficient facts appear on the record of the proceedings underlying the judgment to have permitted . . . adequate review of the ground or issue raised upon the motion" but "no such appellate review . . . occurred owing to the defendant's unjustifiable failure . . . to raise such ground or issue upon an appeal actually perfected by him. . . ." N.Y. CRIM. PROC. LAW 440.10(2)(c).

## 2.   Procedural Default

Respondent argues that the prosecutorial misconduct claims are procedurally barred from habeas review based upon the motion court's on C.P.L. § 440.10(2)(c), which qualifies as an independent and adequate state ground. A habeas court, in general, is procedurally barred from considering a ruling that "fairly appear[s] to rest primarily on state procedural law." Jimenez v. Walker, 458 F.3d 130, 138 (2d Cir. 2006) (citation omitted). Even where the state court has ruled in the alternative on the merits of a federal claim, habeas review is foreclosed where the state court also has expressly relied on the petitioner's procedural default as a basis for dismissal. Green v. Travis, 414 F.3d 288, 294 (2d Cir. 2005) (citation omitted). "To bar federal habeas review, however, the state court's decision must rest not only on an independent procedural bar under state law, but also on one that is "adequate to support the judgment.'" Murden v. Artuz, 497 F.3d 178, 192 (2d Cir. 2007) (quoting Jimenez, 458 F.3d at 138).

To qualify as an "independent" state ground foreclosing habeas review, the trial court's reliance on C.P.L. § 440.10(2)(c) must have been "clear from the face of the opinion[,]" Coleman v. Thompson, 501 U.S. 722, 735 (1991) (citation omitted), which it is. Moreover, its "unambiguous and explicit invocation" of C.P.L. § 440.10(2)(c) "did not implicate or depend on any rule of federal law." Cruz v. Berbary, 456 F. Supp.2d 410, 419 (W.D.N.Y. 2006).

-24-

To be deemed "adequate", § 440.10(2)(c) must be a "'firmly established and regularly followed'" state rule. <u>Lee v. Kemna</u>, 534 U.S. 362, 376 (2002) (quotation omitted). Without question, C.P.L. § 440.10(2)(c) is such a rule. New York law is well settled that "where the record is sufficient to allow appellate review of a claim, the failure to raise that claim on appeal precludes subsequent collateral review of the claim." <u>Alston v. Donnelly</u>, 461 F. Supp.2d 112, 123 (W.D.N.Y. 2006) (citing <u>People v. Cooks</u>, 67 N.Y.2d 100, 103-04 (1986); other citations omitted); <u>see</u> <u>also</u> <u>Clark v. Perez</u>, 510 F.3d 382, 393 (2d Cir. 2008) (reversing district court's decision that state court's application of C.P.L. § 440.10(2)(c) did not constitute an adequate state ground barring review of petitioner's federal habeas petition).

Gifford may overcome this procedural bar only if he can demonstrate either cause for the default and resultant prejudice, or that failure to consider the federal habeas claim will result in a fundamental miscarriage of justice. <u>See</u> <u>Coleman</u>, 501 U.S. at 749-50 (citations omitted). The habeas petitioner bears the burden of making the required showing. <u>See</u> <u>Murden</u>, 497 F.3d at 194 (noting that a petitioner may obtain a merits-review of a procedurally barred constitutional claim "if he shows that equity demands it") (citation omitted). Gifford has not addressed Respondent's procedural default and thus has not attempted to show cause, prejudice, or a fundamental miscarriage of justice.

Accordingly, Gifford has failed to overcome the procedural bar based on the state court's reliance independent and adequate state law ground to dispose of his prosecutorial misconduct claim, and it is dismissed on that basis.

### E.   Ground Five: Ineffective Assistance of Trial Counsel

#### 1.   Overview

Petitioner faults trial counsel for (1) failing to move to suppress the DNA evidence the prosecution obtained from him; (2) failing to call a DNA expert witness to testify for the defense; (3) failing to provide him with personal copies of the prosecution's discovery materials; (4) failing to call "at least three" witnesses who could have provided exculpatory testimony and "other witnesses" who could have identified "another suspect" for both murders. Petitioner raised these claims in his C.P.L. § 440.10 motions, and the trial court adjudicated all of the claims on the merits. Accordingly, the deferential standard of review set forth in 28 U.S.C. § 2254(d)(1) applies.

#### 2.   Relevant Law

For purposes of this Court's AEDPA analysis, <u>Strickland v. Washington</u>, 446 U.S. 668 (1984), "is the relevant 'clearly established Federal law, as determined by the Supreme Court of the United States.'" <u>Aparicio v. Artuz</u>, 269 F.3d 78, 95 & n. 8 (2d Cir. 2001) (quoting 28 U.S.C. § 2254(d)(1)). An ineffective assistance claim under <u>Strickland</u> "has two components: A petitioner must show

that counsel's performance was deficient, and that the deficiency prejudiced the defense." Wiggins v. Smith, 539 U.S. 510, 521 (2003) (citing Strickland, 446 U.S. at 687). Under AEDPA, a petitioner is "not required to further demonstrate that his particular theory of ineffective assistance of counsel is also 'clearly established.'" Aparicio, 269 F.3d 95 & n. 8.   However, he "must do more than show that he would have satisfied Strickland's test if his claim were being analyzed in the first instance. . . ." Bell v. Cone, 535 U.S. 685, 698-99 (2002). Rather, he must show that the state court applied Strickland to the facts of his case in an objectively unreasonable manner. Id. (citation omitted).

As discussed further below, Petitioner cannot fulfill either the "performance" or the "prejudice" elements of Strickland under a de novo standard of review. He necessarily cannot demonstrate that the state court's rejection of his ineffective assistance claims was an "unreasonable application of" or "contrary to" Strickland for purposes of AEDPA.

### 3.   Analysis of Counsel's Alleged Errors

#### a.   Failure to Move to Suppress DNA Evidence

Petitioner asserts that trial counsel was ineffective in failing to move to suppress the DNA evidence the prosecution obtained from him via a buccal swab on the basis that its use violated his right of confidentiality. The trial court denied this claim, correctly finding that trial counsel could not be

ineffective for failing to make a motion that would have been unsuccessful. As the prosecution argued in opposition to the C.P.L. § 440.10 motion, the confidentiality rules found in Executive Law § 995-3 specifically provide that a DNA record may be disclosed to pursuant to § 995-c, which permits release  of information contained in the DNA index to district attorney's offices and other law enforcement agencies for law enforcement identification purposes. See N.Y. Exec. Law § 995-c(6)(a). This exception clearly came into play in Gifford's case, meaning that trial counsel did not have a colorable claim that Gifford's confidentiality was violated. See United States v. Arena, 180 F.3d 380, 396 (2d Cir. 1999) (noting that the "[f]ailure to make a meritless argument does not amount to ineffective assistance").

### b.    Failure to Call a DNA Expert

The law is clear that "[t]he decision whether to call any witnesses on behalf of the defendant, and if so which witnesses to call, is a tactical decision of the sort engaged in by defense attorneys in almost every trial." United States v. Nersesian, 824 F.2d 1294, 1321 (2d Cir.), cert. denied, 484 U.S. 958 (1987). Moreover, the decision whether to call an expert witness at trial generally falls within the realm of strategic choices that Strickland warns against second-guessing. See, e.g., United States v. Kirsh, 54 F.3d 1062, 1072 (2d Cir.) (finding that trial counsel's decision not to call fingerprint expert "was plainly a

-28-

tactical decision and hardly bespeaks professional incompetence"), cert. denied, 516 U.S. 927 (1995). Here, as the trial court found, Gifford failed to demonstrate that there was a DNA expert would have testified in a manner favorable to the defense. Indeed, there is nothing in trial counsel's cross-examination of the prosecution's expert witnesses to suggest that counsel would have been able to obtain an expert who would have testified differently, let alone favorably to his client. See, e.g., James v. United States, No. 00 CIV.8818LAKGWG, S297CR185, 2002 WL 1023146, at *16 (S.D.N.Y. May 20, 2002) ("Despite his claim that his trial counsel was ineffective for failing to retain an expert, James provides no reason to believe that an explosives expert hired by the defense would have offered any exculpatory testimony or indeed any testimony that differed from the Government expert."). Gifford thus is unable to establish that he was prejudiced by trial counsel's election not to call such an expert, or that trial counsel's decision was objectively unreasonable under the circumstances.

### c. Failure to Provide Copies of Discovery Material to Petitioner

Gifford contends that trial counsel was ineffective in failing to provide him personally with copies of the discovery materials disclosed by the prosecution. When Gifford raised this claim in support of his C.P.L. § 440.10 motion, he asserted that trial counsel violated C.P.L. § 240, "New York Rules of Court 3.4(a), (1), (3)"; People v. Rosario, 9 N.Y.2d 268 (1961); People v.

DaGata, 86 N.Y.2d 40 (1995); and Brady v. Maryland, 373 U.S. 83 (1963). These statutes, rules, and cases all pertain to the *prosecution's* duty to provide discovery and other materials, and thus are irrelevant to Petitioner's claim premised on trial counsel's purported withholding of material disclosed by the prosecution. By failing to explain how having this discovery material would have affected his participation in his own defense or counsel's conduct of the trial, Petitioner is unable to satisfy the prejudice prong of the Strickland test. See Hamilton v. Romanowski, No. 5:10-CV-14392, 2012 WL 2224450, at *10 (E.D. Mich. May 7, 2012) (petitioner failed to establish prejudice from counsel's failure to provide him with copies of the discovery materials provided to counsel by the prosecution where petitioner did not explain what exculpatory material the discovery materials may have included, or how the absence of the discovery materials affected his decision to plead guilty).

### d.   Failure to Call Exculpatory Witnesses

Petitioner asserts that trial counsel failed to call three witnesses–James Bailey, Frederick Walker, and Christopher Walker–who allegedly would have provided unspecified exculpatory testimony. In support of his motion to vacate on this basis, he pointed only to depositions that these individuals gave to the police at the time of the murders, approximately a decade before his trial. As the trial court correctly determined, Petitioner

failed to show that any of these individuals "would have provided exculpatory evidence or testimony that would have been helpful to" him, since the depositions they provided to the police "do not exonerate him or otherwise disprove his guilt." C.P.L. § 440.10 Order, p. 3 (Respondent's Appendix O). Consequently, Petitioner is unable to show how these individuals' testimony would have any effect on the outcome of his trial, let alone that they would have assisted the defense. Petitioner's assertion that there were "other witnesses" who "could provide another suspect" with regard to both murders is pure speculation. Petitioner does not identify these witnesses or provide any hint as to who they would have named as alternative suspect in the homicides. Again, Petitioner has failed to show how he was prejudiced by trial counsels failure to further investigate these alleged witnesses' stories.

**V.   Conclusion**

For the foregoing reasons, the petition (Dkt #1) for a writ of habeas corpus is dismissed.  Because Petitioner has failed to make a substantial showing of a denial of a constitutional right, <u>see</u> 28 U.S.C. § 2253(c)(2), no certificate of appealability shall issue. The Clerk of the Court is requested to close this case.

   **SO ORDERED.**

                              S/Michael A. Telesca

                              _____
                              HONORABLE MICHAEL A. TELESCA
                              United States District Judge

DATED:      December 26, 2013
            Rochester, New York